(Not for publication)                                    (Docket Entry Nos. 173, 175)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

_____
                                            :
WORLDWIDE LABOR SUPPORT OF                  :
ILLINOIS, INC.,                             :
                   Plaintiff,               :        Civil No. 05-1105 (RBK/JS)
                                            :
            v.                              :        **OPINION**
                                            :
THE CURA GROUP, INC., et al.,               :
                                            :
                   Defendants.              :
_____     :

**KUGLER**, United States District Judge:

Presently before the Court are two motions for summary judgment. Plaintiff Worldwide

Labor Support of Illinois, Inc. ("Plaintiff" or "WWL") has filed a motion for partial summary

judgment with respect to Counts Three (Breach of Contract), Four (Negligence) and Ten

(Conversion) of its Complaint. Defendants Ujex Enterprises, Inc. ("UJEX"); Ajax Enterprises,

Inc. ("AJAX"), Justin M. Sciarra, Paul Hopkins, and Paul J. Brown ("Defendants") have filed a

motion for summary judgment with respect to Counts Three, Four, Five (Common Law Fraud),

Eight (New Jersey Consumer Fraud Act), Nine (Conspiracy to Commit Common Law Fraud) and

Ten. For the reasons expressed below, Plaintiff's motion will be denied. Defendants' motion

will be granted as to Count Ten and denied as to Counts Three, Four, Five, Eight, and Nine.

1

## I. BACKGROUND

### A. The Service Agreement

Plaintiff is a corporation in the business of providing skilled labor to customers such as shipyards and manufacturing facilities. (Thompson Decl. Ex. G, Deposition of Wayne Cook, at 8.) In August, 2001 Plaintiff needed to replace its workers' compensation coverage. (Plaintiff's Statement of Undisputed Material Facts and Defs.' response at ¶ 23.) Defendant Clifford Bray[1] introduced Plaintiff to America's PEO, Inc. ("America's PEO"), a professional employers organization. On August 3, 2001, Bray sent Hopkins, president of America's PEO, documents regarding the nature of Plaintiff's operations. These documents indicated that Plaintiff sought United States Longshore and Harbor Workers' Compensation Act ("USL&HA") insurance coverage for its workers, that Plaintiff had shipbuilders at Kvaerner shipyard, and that Plaintiff had employees in Mississippi and Texas. (Thompson Decl. Ex. N.) Hopkins told Plaintiff that because America's PEO placed a high volume of workers' compensation insurance and maintained a high deductible on its policies, America's PEO was eligible for lower premiums. Hopkins said that America's PEO could pass those savings along to Plaintiff. Hopkins also said that America's PEO could obtain USL&HA coverage. (Thompson Decl. Ex. K, Nov. 22 Deposition of Hopkins at 82-83.)

On August 13, 2001, Plaintiff entered into an agreement ("the Service Agreement") with America's PEO. Under this agreement, America's PEO agreed to provide employees for Plaintiff and to provide workers' compensation insurance coverage for these employees.

---

[1] Defendants claim that Bray was Plaintiff's broker. Plaintiff claims that Bray was an independent broker who regularly performed broker services for America's PEO and was compensated for those services.

(Thompson Decl. Ex. O, Service Agreement.)

**B. The Granite State Policy**

America's PEO procured USL&HA coverage for Plaintiff through Sciarra or his company UJEX.[2]  Before America's PEO entered into the Service Agreement, Sciarra had told Hopkins that he could obtain USL&HA insurance.  (Thompson Decl. Ex. K, Nov. 22 Deposition of Hopkins, at 80-81.)  Around the time Sciarra obtained insurance for Plaintiff, he met with Hopkins and Wayne Cook, the president of WWL, to discuss Plaintiff's insurance needs with respect to the Kvaerner Shipyard.  (Thompson Decl. Ex. H, Deposition of Sciarra, at 219, 222.)

On or about August 16, 2001, Sciarra completed an application seeking USL&HA insurance for UJEX and submitted it to Accordia, an insurance producer.  (Thompson Decl. Ex. P, Application; Thompson Ex. H, Deposition of Sciarra, at 395.)  The application was limited to what Sciarra characterized as UJEX employees at the Kvaerner work site.  The application, which was intended to cover Plaintiff's employees,[3] did not mention WWL's name.  The application estimated that annual payroll was $200,000.  (Thompson Decl. Ex. P, Application) The actual weekly payroll at the Kvaerner site was $33,197, and this figure had been sent to America's PEO in early August.  (Thompson Decl. Ex. N.)  Sciarra did not ask about the number of WWL workers at Kvaerner.  (Deposition of Sciarra at 228.)  Paul Brown, Sciarra's employee, signed the application as insurance producer.  (Thompson Decl. Ex. P.)  Brown did not ask any

---

[2] Plaintiff contends that America's PEO contracted directly with Sciarra. Defendants argue that America's PEO contracted with Sciarra's company, UJEX.  The parties agree that Sciarra was the sole shareholder, officer and director of both UJEX and AJAX.  (Deposition of Sciarra at 24-25, 29-30.)

[3] According to Defendants, the policy was intended for UJEX employees, including but not limited to Plaintiff's workers.

questions at the time he signed this application. (Pl.'s Statement of Undisputed Material Facts and Defendants' response at ¶ 152.)

Based on the application submitted by Sciarra, Granite State issued a policy on September 18, 2001, listing UJEX as the named insured.  The policy documents indicated that the policy applied to Pennsylvania workers' compensation law and USL&HA for work done in Pennsylvania.  (Thompson Decl. Ex. S, Granite State Policy.)  Plaintiff received a certificate of insurance for the Granite State Policy, which listed UJEX and America's PEO as insured and listed Plaintiff as the certificate holder.  (Rasco Decl. Ex. E.)

On or about April 30, 2002, Sciarra and Brown requested cancellation of the Granite State policy effective January 21, 2002, in the middle of the coverage period.  Sciarra claims he did so because a representative from America's PEO gave him a certificate of insurance purporting to show coverage for the WWL and FGH workforces through another company. Sciarra had doubts about the validity of this insurance certificate and the purported replacement coverage and was unable to confirm the existence of the insurer or the coverage with the Departments of Insurance of New Jersey and Pennsylvania.  Sciarra did not provide notice to WWL that the Granite State policy was going to be cancelled.  Hopkins claimed he was not aware that the policy had been cancelled.  (Pl.'s Statement of Undisputed Material Facts and Defs.' response at ¶¶ 127-132.)

### C.  Legion Policy

In addition to the Granite State Policy, America's PEO provided a certificate of insurance to Plaintiff stating that a policy had been issued by Legion Insurance Company to AJAX and America's PEO.  This certificate contained Brown's signature.  (Thompson Decl. Ex. V;

Deposition of Brown at 66.)  Sciarra testified that he played a role in negotiating this coverage

and that he prepared the application.  (Deposition of Sciarra at 186.)[4]  The coverage amounts on

the certificate differed from the coverage amounts under the Legion Policy.  (Thompson Decl.

Exs. V, W.)  Hopkins testified that he believed the Legion policy provided coverage to Plaintiff

for the states listed in the Addendum to the Service Agreement –  Alabama, Illinois, Kentucky,

Mississippi, Texas, and Wisconsin.  (Dec. 2 Deposition of Hopkins at 365, Thompson Decl. Ex.

O.)  The Legion Policy listed coverage in Pennsylvania, New Jersey and New York.  (Thompson

Decl. Ex. W.)[5]  Sciarra testified that members of the WWL workforce who became AJAX

employees were never covered under the Legion Policy.  (Deposition of Sciarra at 355-56.)  The

Legion Policy did not provide USL&HA coverage.  (Deposition of Sciarra at 196.)

       Sciarra testified that coverage would be available for WWL laborers in states other than

Pennsylvania, New York and New Jersey if he called the underwriter of the Legion Policy.

Sciarra testified that he could not recall if he ever made such a call.  (Deposition of Sciarra at

357.)

---

    [4] Between 2000 and 2004, Sciarra had an ownership interest in an offshore "rent-a-captive" insurance program called Mutual Holdings Incorporated.  His participation in this program allowed him and his companies to place insurance through Legion Insurance Company, an affiliate of Mutual Holdings.  (Pl.'s Statement of Undisputed Material Facts and Defendants' response at ¶¶ 15-16.)  Sciarra maintains that the Legion Insurance policy existed before WWL ever contacted America's PEO and that it was not obtained with an application.  (Defs.' response to Pl.'s Statement of Undisputed Material Facts at ¶ 62.)

    [5] Defendants state that in their opinion "some being expert, the Legion Policy would have addressed WWL standard workers' compensation claims in all states had any been presented." (Defs.' Response to Pl.'s Statement of Undisputed Material Facts at ¶ 66.)  Defendants cite no evidence to support this statement.

### D.  FGH Contract

On or about October 15, 2001, after the Granite State and Legion Policies had been issued, Plaintiff entered into a contract with Friede Goldman Halter, Inc. ("FGH").  Under the FGH contract, Plaintiff agreed to provide temporary employees to fill job assignments of FGH and to obtain workers' compensation insurance for the FGH workforce.   FGH agreed that it would be responsible for reimbursing WWL or WWL's insurer for the first $250,000 of any workers' compensation claim made by any employee subject to the contract. (Thompson Decl. Ex. AA, FGH Contract.)

Before WWL entered into the FGH contract, Bray and Cook contacted Hopkins to discuss WWL's possible "acquisition" of the FGH workforce.  Hopkins agreed that America's PEO would add the FGH workforce as WWL employees for the purpose of providing USL&HA insurance.  Hopkins knew that the FGH workforce included shipbuilding employees working in Texas, Louisiana and Mississippi who needed coverage for USL&HA claims.  (March 8 Deposition of Hopkins at 25-29.)

Hopkins testified that he talked to Sciarra about the need to obtain USL&HA coverage for states other than Pennsylvania to cover the FGH workforce.  Hopkins further testified that Sciarra told him the Granite State policy could be expanded to include USL&HA coverage in the states where America's PEO needed to cover the FGH workforce.  (Dec. 2 Deposition of Hopkins at 342-43).  Sciarra testified that he could not recall if Hopkins ever told him that he needed to obtain USL&HA coverage for WWL workers outside of the state of Pennsylvania.  He also testified that he could not recall if he ever told Hopkins that he could expand the Granite State policy to cover USL&HA exposure outside of Pennsylvania.  (Deposition of Sciarra at 328-

6

29.)

Hopkins testified that Sciarra sent America's PEO a certificate which indicated the Granite State Policy had been expanded to cover states other than Pennsylvania.  (Dec. 2 Deposition of Hopkins at 343-44 and 366; Thompson Decl. Ex T.)  Hopkins testified that he believed that when a client's exposure expands to other states during the insurance policy term, the policy automatically picks up the expansion.  (Dec. 2 Deposition of Hopkins at 368.) America's PEO sent certificates of insurance to WWL purporting to demonstrate that FGH had been added to the Granite State Policy.  (Thompson Decl. Exs. T, OO; Rasco Decl. at ¶¶ 7-8 and Ex. D.)  Other certificates of insurance were sent to WWL purporting to show that USL&HA coverage had been obtained and that FGH was an additional named insured under the Legion Policy.  (Thompson Decl. Ex. EE; Rasco Decl. ¶ 8 and Ex. C.)  Between October 15, 2001 and March 1, 2002, America's PEO sent WWL separate invoices for the FGH work force, and charged a flat weekly rate of $84,519 to provide workers' compensation.  (March 8 Deposition of Hopkins at 39-40.)

Between October 15, 2001 and March 1, 2002, several members of the FGH workforce sustained injuries and filed claims under the USL&HA.  (Thompson Decl. ¶ 5 and Rasco Decl. ¶ 12.)  For example, FGH worker Carl Dunn claimed he sustained injuries on January 23, 2002 in Mississippi.  WWL submitted the claim to Granite State for coverage, and the claim was denied because WWL/FGH was "not named as an insured employer under the policy" and because "the incident in which [Dunn] was injured [was] not a covered workplace under the policy." (Thompson Decl. Ex. B.)  When indemnity and medical expenses on Dunn's claim exceeded FGH's self-insured retention of $250,000, WWL made medical payments for the benefit of Dunn

7

exceeding $30,000.  (Rasco Decl. at ¶ 12.)  In or about August 2008, the Dunn claim was

mediated and settled for $232,000, which was paid by WWL.  (Rasco Decl. at ¶ 12 and Ex. H;

Thompson Decl. Ex. C.)  According to WWL, FGH workers David Chandler and Thomas

Conway also sustained injuries in Mississippi and filed claims under the USL&HA, and their

claims could exceed, but have not yet exceeded, the $250,000 self insured retention for which

FGH is responsible under its agreement with WWL.  (Thompson Decl. at ¶ 5.)

### E.  Prior Litigation

In March 2003, Granite State and AIG Claims Services, Inc. filed a lawsuit against UJEX,

AJAX, Sciarra, Brown, Hopkins, America's PEO, WWL, and others, claiming that the

defendants conspired to defraud Granite State in connection with the procurement of workers'

compensation insurance policies.  Plaintiffs alleged that the defendants misrepresented on

insurance applications the class and number of employees as well as the estimated payroll.

WWL filed a counterclaim, arguing that it was insured under a Granite State policy and that

Granite State breached the insurance contract by refusing to pay the claims of employees for

whose benefit the Policy was issued and by refusing to defend Worldwide against their claims.

Granite State Ins. Co. v. UJEX, Inc., No. 03-cv-1220, 2005 WL 1618792, at *1 (D.N.J. July 11,

2005).

The court granted a motion for summary judgment filed by Worldwide, and ordered

Granite State to provide insurance coverage to WWL consistent with the terms of the Granite

State policy.  Id. at *10.  The court noted that the Granite State "application expressly stated that

it was to cover employees leased for shipbuilding operations at Kvaerner Philadelphia Shipyard."

Id. at *2.  The court found that the employment and payroll figures and employment

classification codes on the application forms were reasonable estimates and did not give rise to a

claim for fraud.  Id. at *8.  The court also found that the failure to include WWL as an additional

insured on the insurance application was not a material omission.  Id. at *6.

### F.  Procedural History

Plaintiff filed its Second Amended Complaint in this case on September 29, 2006.

Subsequently, Plaintiff and Defendants UJEX, AJAX, Sciarra, Hopkins and Brown filed motions

for summary judgment.  The Counts at issue in the pending motions for summary judgment are:

Count Three (Breach of Contract as to Third Party Beneficiary); Count Four (Negligence); Count

Five (Common Law Fraud); Count Eight (New Jersey Consumer Fraud Act); Count Nine

(Conspiracy to Commit Common Law Fraud); and Count Ten (Conversion).

## II.  STANDARD

Summary judgment is appropriate where the Court is satisfied that "there is no genuine

issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(c).  A genuine issue of material fact exists "if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248 (1986).  "In considering a motion for summary judgment, a district court may not make

credibility determinations or engage in any weighing of the evidence; instead, the non-moving

party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'"

Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at

255).

"[T]he party moving for summary judgment under Fed.R.Civ.P. 56(c) bears the burden of

demonstrating the absence of any genuine issues of material fact."  Aman v. Cort Furniture

Rental Corp., 85 F.3d 1074, 1080 (3d Cir. 1996).  The moving party may satisfy its burden either by "produc[ing] evidence showing the absence of a genuine issue of material fact" or by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  If the moving party satisfies its burden, the nonmoving party must respond by "set[ting] out specific facts showing a genuine issue for trial.  If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party."  Fed. R. Civ. P. 56(e)(2).

## III.  DISCUSSION

### A.  Breach of Contract (Count Three)

Both Plaintiff and Defendants seek summary judgment on Plaintiff's claim for breach of contract as a third party beneficiary.  However, Defendants, in their brief in support of their motion for summary judgment, have not made any legal argument regarding breach of contract.  Therefore, Defendants' motion for summary judgment with respect to Count Three will be denied.  Plaintiff also seeks summary judgment on Count Three, arguing that Plaintiff is a third party beneficiary of the contract between America's PEO, on the one hand, and Sciarra, UJEX and AJAX on the other.  Plaintiff argues that Sciarra, UJEX and AJAX breached this contract.

Defendants respond that in light of the Granite State court's holding that Granite State was obligated to provide coverage to WWL and the fact that all remaining claims subsequent to May 21, 2002 have been covered under a policy issued by C.N.A., WWL cannot show that there was a complete failure of coverage.  However, because Granite State involved only claims arising out of incidents at the Kvaerner site, the Court finds that the Granite State court's finding that Granite State was obligated to provide coverage to WWL does not preclude WWL from

arguing that Sciarra and his companies breached their contract with America's PEO in failing to

obtain coverage for workers outside of Pennsylvania.  Further, Plaintiff need not show a

complete failure of coverage to prove that there was a breach of the contract.

Defendants further argue that there is a genuine issue of fact as to whether WWL was a

third party beneficiary of the contract at issue.  The Court need not reach the issue of whether

WWL was a third party beneficiary, because even if it was, the parties' obligations under the

contract are unclear.[6]  Therefore, the Court cannot determine whether Sciarra, UJEX or AJAX

breached the contract.

There is conflicting evidence regarding the duties of Sciarra, UJEX and AJAX under their

contract with America's PEO.  America's PEO's answers to WWL's interrogatories stated that

America's PEO "contracted with co-defendant, Justin Sciarra, to procure a USL&H workers'

compensation policy which was to cover the Worldwide employees assigned to the Kaverner

[sic] Shipyard in Philadelphia, PA."  (Thompson Decl. Ex. M.)  Hopkins testified that he

informed Sciarra of the need to obtain USL&HA insurance outside of Pennsylvania for the FGH

workforce.  Hopkins further testified that Sciarra told him that the Granite State policy could be

expanded to states other than Pennsylvania and that Sciarra gave him a certificate indicating that

the expansion had occurred.  (Dec. 2 Deposition of Hopkins at 342-43.)  Sciarra, on the other

hand, testified that he did not know that USL&HA coverage outside of Pennsylvania was needed

---

[6] According to Hopkins, there was a master agreement between America's PEO and
Sciarra, whereby America's PEO assigned one-third of its clients to Sciarra.  (Dec. 2 Deposition
of Hopkins at 347.)  It is unclear whether this agreement was written.  (Deposition of Sciarra at
169.)  There were no specific written agreements for each client company of America's PEO that
was assigned to Sciarra; rather, Sciarra would accept each client verbally.  (Dec. 2 Deposition of
Hopkins at 347; Deposition of Sciarra at 383.)

11

for FGH.  (Deposition of Sciarra at 329.)  In sum, there is a genuine issue as to what Sciarra,

UJEX or AJAX's obligations were under the contract with America's PEO, and therefore

Plaintiff's motion for summary judgment on Count Three will be denied.

### B.  Negligence (Count Four)

Both Plaintiff and Defendants have moved for summary judgment on Count Four of the

complaint.  Plaintiff alleges that Sciarra and Brown, as insurance producers, owed a duty of care

to WWL, and that they breached this duty causing WWL to suffer damages.  The parties disagree

as to whether Sciarra and Brown owed a duty to WWL.

First, the parties disagree as to whether Sciarra and Brown were insurance producers for

the policies at issue.  An insurance producer is one who "solicits negotiates or sells contracts of

insurance."  N.J. Admin. Code § 11:17A-1.3(b) (explaining who must obtain insurance producer

license in New Jersey).  "Engaging in a single act or transaction of the business of an insurance

producer, or holding oneself out to the public or an insurance producer as being so engaged, shall

be sufficient proof of engaging in the business of an insurance producer . . . ."  N.J. Admin. Code

§ 11:17A-1.3(c).  The following activities are examples of selling, soliciting or negotiating an

insurance contract:

> 4. Completing or signing applications for insurance if the person is other than the
> applicant's authorized representative; . . .
> 6. Making or proposing to make an insurance contract;
> 7. Disseminating information as to coverages in general or for any particular
> policy, except that this shall not prohibit the dissemination of buyer's guides or
> applications for coverage in response to requests from prospective policyholders; .
> . .
> 10. Discussing or describing the coverages or terms of a proposed contract of
> insurance with a prospective policyholder, including counseling as to which
> coverages to buy; . . .
> 11. Recommending or independently initiating additions or deletions to an

insured's policy; . . . .

N.J. Admin. Code § 11:17A-1.4(b).  An insurance producer owes a fiduciary duty of care to the insured.  Aden v. Fortsh, 776 A.2d 792, 800 (N.J. 2001).

In this case, the Court finds that neither party has presented conclusive evidence as to whether Sciarra and Brown were insurance producers of the policies in question.  Defendants note that the Granite State policy lists Marine Managers as the producer.  (Defs' Ex. B.) However, the fact that neither Brown nor Sciarra is listed as the producer on the Granite State policy is not determinative as to whether they were insurance producers.  The law does not require a person to be listed as "producer" on an insurance policy to be an insurance producer. See N.J. Admin. Code § 11:17A-1.3(b).  Defendants also argue that America's PEO engaged UJEX, not Sciarra.  However, there is some evidence that Sciarra was involved in negotiating the contracts and preparing applications for the policies at issue.  (Deposition of Sciarra at 186, 395.) Further, Plaintiffs have presented some evidence that Brown was an insurance producer, specifically that Brown signed the application for the Granite State policy as an insurance producer.  (Deposition of Brown at 87; Defs.' Ex. C.)  In sum, there is some evidence that Sciarra and Brown were insurance producers for the policies at issue.  However, the evidence does not establish that there is no genuine issue as to whether Sciarra and Brown were insurance producers, and therefore Plaintiff's motion for summary judgment will be denied.

In further support of their motion for summary judgment, Defendants argue that even if they were insurance producers for the policies at issue, there was no insurance broker relationship between WWL and Sciarra or Brown.  However, the Court finds that if Sciarra and Brown did in fact procure the policies at issue, they owed a duty to those insured under the

policies, including WWL.[7]  This duty would exist even though there was no contract between WWL and Sciarra or Brown, and even if Cook never sought advice directly from Sciarra or Brown.  Thus, Defendants' motion for summary judgment on the negligence claim will also be denied.

### C.  Common Law Fraud (Count Five)

Defendants' motion for summary judgment with respect to Count Five of WWL's complaint will be denied because they have failed to show that there is no genuine issue of material fact.  "The five elements of common-law fraud are: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages."  Gennari v. Weichert Co. Realtors, 691 A.2d 350, 367 (N.J. 1997).

Hopkins, Sciarra and Brown make seven arguments in support of their motion for summary judgment.  First, they argue that the fact that in the Granite State case, WWL was able to compel Granite State to pay six of seven claims submitted by employee shipbuilders precludes a fraud count against them.  Second, they argue that the statements of fact WWL claims were false were all substantially true.  Third, they argue that some of the statements were not statements of fact, but rather "promises of potential contract future performance based on specifics which were never made transparent by either party." (Defs.' Brief at 7.)  Fourth, they argue that there is no evidence of an intent to defraud WWL.  Fifth, they argue that Plaintiff's

---

[7] Defendants argue that WWL was not an "actual" insured under the Granite State policy. (Defs.' Brief in Support of Motion for Summary Judgment at 19.)  However, this argument is contradicted by the Granite State court's holding that WWL was insured under the Granite State policy, and by Defendants' own brief, which states that the Granite State policy was procured for UJEX, America's PEO and WWL.  (Id. at 20.)

second amended complaint does not satisfy the requirements of Fed. R. Civ. P. 9(b). Sixth, they

argue that WWL cannot show that it suffered damages as a result of any allegedly false

statements. Finally, they argue that they cannot be held liable for failing to disclose to Plaintiff

that UJEX had terminated its contract with America's PEO and had requested cancellation of the

Granite State policy effective January 21, 2002.

### 1. Effect of Prior Litigation

WWL's success in the Granite State case does not preclude a fraud claim in this case.

The court held that Granite State was obligated to provide insurance coverage to WWL under

policy 6742564. 2005 WL 1618792, at *2, 7. This policy, on its face, provides workers'

compensation insurance for the state of Pennsylvania only. (Thompson Decl. Ex. S.) Granite

State involved only claims filed by WWL/UJEX employees working at the Kvaerner site in

Pennsylvania. See 2005 WL 1618792, at *4. Thus, the Granite State case does not, as

Defendants claim, establish that Granite State is obligated to provide coverage to WWL for the

workers' compensation claims involved in this case, claims arising out of incidents in

Mississippi.

The Granite State court also found that WWL did not commit fraud by not including its

own name on the policy application and by listing estimates of payroll rather than the actual

payroll at the Kvaerner site. Id. at *6, 8. However, the court did not address whether Sciarra,

Hopkins and Brown made false statements to WWL regarding the scope of the Granite State

policy coverage.

## 2. Sufficiency of the Complaint

A plaintiff alleging fraud must, in its complaint, "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). The purpose of this requirement is "to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." Lum v. Bank of Am., 361 F.3d 217, 223-24 (3d Cir. 2004) (quoting Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir.1984)). The Third Circuit Court of Appeals has explained how Plaintiffs may satisfy the requirement of Fed. R. Civ. P. 9(b):

> Plaintiffs may satisfy this requirement by pleading the "date, place or time" of the fraud, or through "alternative means of injecting precision and some measure of substantiation into their allegations of fraud." Plaintiffs also must allege who made a misrepresentation to whom and the general content of the misrepresentation.

Lum, 361 F.3d at 224 (citations omitted).

In Count Five of its complaint, WWL alleged that Bray, America's PEO, APEO, Hopkins and/or Brown represented to WWL that:

> (a) America's PEO was capable of obtaining insurance coverage for USL&HA claims; (b) because of the large volume of insurance business which it placed, America's PEO could obtain lower premiums which it would pass through to Worldwide; (c) Hopkins, America's PEO, Sciarra and Brown had procured valid and sufficient workers' compensation insurance including USL&HA insurance covering Worldwide and FGH as additional insureds; (d) the issuance of certificates of insurance misrepresenting (i) the Granite Policy limits; (ii) Worldwide and FGH workforces were insureds under the Granite Policy; (iii) the scope of coverage provided under the Granite Policy.

(Complaint at ¶ 88.)

When considered in conjunction with earlier allegations in the complaint, the first two alleged representations are described sufficiently for purposes of Fed. R. Civ. P. 9(b).

16

Specifically, WWL alleges in Paragraph 33 of its complaint that the first alleged misrepresentation was made by Hopkins and Bray in or about July and August 2001.  Further, WWL alleges in Paragraph 30 of its complaint that the second alleged misrepresentation was made by Bray, America's PEO and Hopkins in or about July and August 2001.

The third alleged misrepresentation is described with less precision.  In the complaint, WWL alleges that "America's PEO, APEO, Hopkins, Sciarra and Brown, through both the certificates of insurance and verbally, represented that the Granite Policy provided USL&HA insurance coverage for the Worldwide and FGH Workforces for the period August 2001 through August 2002 in the amount of $500,000 for each accident or disease, and total disease limits of $500,000."  (Complaint at  ¶ 49.)  With the exception of the certificates (discussed below), these statements are not described with sufficient detail.  For example, it is not clear when these statements were made or how many of them there were.

The certificates mentioned in the third and fourth allegations of misrepresentations are described with sufficient precision in paragraphs 43 and 45 of the complaint.  WWL alleges that "[i]n or about August 8, 2001, America's PEO, APEO and Brown provided certificates of insurance to Worldwide stating that Policy Number WC1-1604401 had been issued by Legion Insurance Company (the "Legion Policy") to AJAX Enterprises, Inc. and America's PEO through the period November 20, 2001.  The certificates listed Worldwide as an additional insured and the certificate holder."  (Complaint at ¶ 43.)  WWL further alleges that "[i]n or about February 2002, and on various other dates, America's PEO, APEO and Brown provided certificates of insurance to Worldwide stating that Policy number WC 674-25-64 (the "Granite Policy") had been issued by Granite State Insurance Company to UJEX Enterprises, Inc. and America's PEO.

The certificates listed Worldwide and FGH as additional insureds under the Granite Policy and listed Worldwide as the certificate holder." (Complaint at ¶ 45.)

### 3.  Factual Nature and Falsity of Statements[8]

The Court finds that WWL has not pointed to evidence showing the falsity of the statement that America's PEO was capable of obtaining insurance coverage for USL&HA claims.  To the contrary, America's PEO was capable of obtaining coverage for USL&HA claims, and in fact did obtain coverage for such claims.  (See Thompson Decl. Ex. S, Granite State Policy.)  The fact that America's PEO engaged Sciarra or his companies to obtain the USL&HA coverage does not make the statement that America's PEO could obtain such coverage false.  Nor does the fact that America's PEO had not obtained USL&HA insurance in the past.

Nor has WWL, in its brief, pointed to evidence showing the falsity of the statement that because of the large volume of insurance business which it placed, America's PEO could obtain lower premiums which it would pass through to Worldwide.  WWL has not pointed to any evidence regarding the amount of insurance business America's PEO placed and whether America's PEO obtained lower premiums than it would have if it placed less insurance business.  Furthermore, it is not clear how much America's PEO paid specifically for insurance coverage for WWL or how much America's PEO charged WWL specifically for insurance coverage.

With respect to the certificates of insurance, the Court finds that these contained statements of fact as to the scope of the policies.  Further, the Court finds that there is evidence that some statements in these certificates were false.  For example, some of the certificates state

---

[8] While Plaintiff lists additional alleged misrepresentations in its Brief in Opposition to Defendants' motion for summary judgment, the Court's analysis is limited to those statements mentioned in Count Five of Plaintiff's complaint.

that FGH was an additional insured under the Granite State Policy.  (Rasco Decl. Ex. D;

Thompson Decl. Exs. T, OO.)  However, according to Granite State, FGH was not an insured.

(Thompson Decl. Ex. B.)

### 4. Intent to Defraud

A motion for summary judgment "should ordinarily not be granted where an action . . .

requires determination of a state of mind or intent."  Pressler, Current N.J. Court Rules,

Comment R. 4:46-2[5] (2009).  The New Jersey Supreme Court has further explained this

principle in the context of a motion for summary judgment by a defendant accused of fraud:

> Where . . . the opposing party charges the moving party with willful fraud and
> must probe the conscience of the moving party . . . to prove his case, or in any
> case where the subjective elements of willfulness, intent or good faith of the
> moving party are material to the claim or defense of the opposing party, a
> conclusion from papers alone that palpably there exists no genuine issue of
> material fact will ordinarily be very difficult to sustain. The telltale factor of
> demeanor in the presence of the trier of fact often assumes such vital importance
> in such cases that the opposing party should generally not be denied the
> opportunity to have the moving party . . . appear on the witness stand before the
> trial of fact.  Indeed, subjective elements aside, a note of caution has been sounded
> as to any case where the opposing party must prove his claim or defense from
> what he can draw from the other party.

Judson v. Peoples Bank & Trust Co. of Westfield, 110 A.2d 24, 28 (N.J. 1954) (internal citations

omitted).  In this case, summary judgment for Defendants is not appropriate based on the element

of intent.  The evidence that Defendants sent WWL certificates of insurance indicating that the

FGH workforce was insured, combined with the evidence that the FGH workforce was not

insured, could give rise to an inference of fraudulent intent.  Ultimately, Defendants' intent is a

matter that must be determined by the trier of fact.

### 5.  Damages

Defendants argue that they are entitled to summary judgment because WWL cannot show that it has suffered damages as a result of any misrepresentations Defendants allegedly made.[9] The court finds that there is a genuine issue of fact as to the cause of WWL's damages. According to Defendants, the only reason that Granite State offered for its denial of the Dunn claim was that UJEX failed to notify Granite State of the work location in the state of Mississippi. (Defs.' Brief in Support of Motion for Summary Judgment at 9-10.)  Defendants cite the Declaration of Sciarra in support of this argument.  However, Sciarra does not offer this explanation for the denial of the Dunn Claim in his declaration.  Defendants further argue that Granite State admitted that if the work location had been identified, Granite State would cover this claim.  Defendants do not point to evidence that Granite State made such an admission.

Granite State's explanation as to why the Dunn claim was denied was that FGH was not a covered employer and Dunn's work site was not covered.  (Thompson Decl. Ex. B.)  Thus, there is a genuine issue as to whether the damages WWL suffered with regard to the Dunn claim were caused by Defendants' alleged misrepresentations regarding the Granite State policy's coverage of FGH workers.

### 6.  Termination of Contract Between UJEX and America's PEO and Cancellation of Granite State Policy

Defendants argue that Hopkins, Sciarra and Brown cannot be held liable for failing to disclose to WWL that UJEX had terminated its contract with America's PEO and had requested

---

[9] Defendants also argue that they are entitled to summary judgment on all claims because Plaintiff has not presented evidence of damages.  There is, however, evidence that WWL suffered damages in connection with the Dunn claim.  (See Rasco Decl. at ¶ 12 and Ex. H; Thompson Decl. Ex. C.)

cancellation of the Granite State Policy effective January 21, 2002.  The Court notes that WWL's allegations of fraud in the complaint did not include this alleged failure to disclose.  (Second Amended Complaint at ¶ 88.)  Further, WWL has not pursued this argument in its response to Defendants' motion for summary judgment on the fraud claim.  Therefore, the Court finds that any failure to disclose the termination of the contract between UJEX and America's PEO and the cancellation of the Granite State Policy cannot be the basis for a fraud claim.

### D.  Conspiracy to Commit Common Law Fraud (Count Nine)

Defendants have moved for summary judgment on the conspiracy to commit common law fraud claim, reiterating the arguments they made with respect to the common law fraud claim, and adding that there is no evidence of any conspiracy.  The Court will deny Defendants' motion for summary judgment on the conspiracy claim.  "A civil conspiracy is 'a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another,' and 'an overt act that results in damage.'"  Morgan v. Union County Bd. of Chosen Freeholders, 633 A.2d 985, 998 (N.J. Super. Ct. App. Div. 1993) (quoting Rotermund v. United States Steel Corp., 474 F.2d 1139, 1145 (8th Cir. 1973)).  "The gist of the claim is not the unlawful agreement, 'but the underlying wrong which, absent the conspiracy, would give a right of action.'"  Morgan, 633 A.2d at 998 (quoting Bd. of Educ. v. Hoek, 183 A.2d 633, 646 (1962)).

Because the Court has already found that there is sufficient evidence of fraud to warrant the denial of Defendants' motion for summary judgment on the common law fraud claim, the only remaining issue is the existence of an agreement among the defendants.  A plaintiff need not

provide direct evidence of such an agreement.  <u>Morgan</u>, 633 A.2d at 998.  Further, "the question whether an agreement exists should not be taken from the jury in a civil conspiracy case so long as there is a possibility that the jury can 'infer from the circumstances [that the alleged conspirators] had a meeting of the minds and thus reached an understanding' to achieve the conspiracy's objectives."  <u>Id.</u> (quoting <u>Hampton v. Hanrahan</u>, 600 F.2d 600, 621 (7th Cir. 1979), *rev'd on other grounds*, 446 U.S. 754 (1980)).  The relationship between the defendants can be circumstantial evidence of a conspiracy.  <u>See</u> <u>Lopez v. Swyer</u>, 279 A.2d 116, 124-25 (N.J. Super. Ct. App. Div. 1971) (denying defendants' motion for summary judgment where two defendants were partners and referred patients to third defendant in exchange for portion of fee).  Here, Hopkins and America's PEO engaged Sciarra and his companies to procure insurance for their clients, including WWL.  It is possible to infer from the relationship of the defendants that there was an agreement to commit the fraud alleged.

**E.  New Jersey Consumer Fraud Act (Count Eight)**

Sciarra and Hopkins seek summary judgment on Count Eight of Plaintiff's complaint, arguing that they did not engage in marketing and that the New Jersey Consumer Fraud Act should not apply to the sale of professional employer organization (PEO) services to other commercial businesses.  The Court is not persuaded by Defendants' argument that the CFA should not apply to the sale of PEO services, and the Court finds that there is evidence that Defendants violated the CFA.  For these reasons, Defendants' motion for summary judgment with respect to Count Eight of Plaintiff's complaint will be denied.

22

### 1.  Applicability of the New Jersey Consumer Fraud Act

New Jersey courts appear not to have addressed the issue of whether the New Jersey Consumer Fraud Act ("CFA") applies to the sale of PEO services to businesses.  Defendants compare the sale of PEO services to the sale of securities, to which the CFA does not apply.  See In re Catanella, 583 F. Supp. 1388, 1444 (E.D. Pa. 1984) (predicting that New Jersey Supreme Court would find CFA inapplicable to sale of securities); Stella v. Dean Witter Reynolds, Inc., 574 A.2d 468, 478 (N.J. Super. Ct. App. Div. 1990) ("[F]raud in the sale of shares of stock or other securities is not within the compass of [the CFA].").

The primary reason that courts have found the CFA inapplicable to the sale of securities is the legislative history of the CFA.  See Stella, 574 A.2d at 478 ("We agree with [In re Catanella] that . . . legislative history demonstrates that the Consumer Fraud Act was not intended to create a cause of action for fraud in connection with the sale of securities.").  This reasoning is inapplicable to the sale of PEO services.

Defendants cite a second rationale the In re Catanella court offered for holding that the CFA is inapplicable to the sale of securities, a rationale not mentioned by the New Jersey court in Stella.  The In re Catanella court distinguished "professional or semi-professional services," to which the CFA did not apply, and "'consumer' services," to which the CFA did apply.  583 F. Supp. at 1443.  The court explained that the New Jersey Uniform Securities Law already regulated the sale of securities.  Id.  Here, defendants do not cite any statute that regulates the sale of PEO services to the extent that the sale of securities is regulated.

Finally, Defendants also cite In re Catanella for the proposition that "[s]ecurities fraud is qualitatively different from the archetypal installment credit sale scam where the uneducated are

23

duped into buying inferior consumer goods at exorbitant prices."  Id.  However, since In re

Catanella, New Jersey courts have made clear that the protection of the CFA is not limited to

"the poor, the naive and the uneducated."  Hundred East Credit Corp. v. Eric Shuster Corp., 515

A.2d 246, 248 (N.J. Super. Ct. App. Div. 1986) (citation omitted) (holding that CFA applied to

sale of computer peripherals to business).  In sum, the Court is not persuaded that any of the

rationales for excluding the sale of securities from the CFA is applicable to the sale of PEO

services.

### 2.  Whether Defendants Marketed Merchandise

Defendants also argue that they are entitled to summary judgment on Plaintiff's CFA

claim because WWL's agents, Bray and Bullock, sought out America's PEO, and therefore there

was no marketing by the defendants, either to the public or to WWL.

The CFA provides:

> The act, use or employment by any person of any unconscionable commercial
> practice, deception, fraud, false pretense, false promise, misrepresentation, or the
> knowing, concealment, suppression, or omission of any material fact with intent
> that others rely upon such concealment, suppression or omission, in connection
> with the sale or advertisement of any merchandise or real estate, or with the
> subsequent performance of such person as aforesaid, whether or not any person
> has in fact been misled, deceived or damaged thereby, is declared to be an
> unlawful practice . . . .

N.J. Stat. Ann. § 56:8-2 (West 2001).  Services are considered "merchandise" for purposes of the

CFA.  See N.J. Stat. Ann. § 56:8-1 (defining merchandise).  A fraudulent act or omission in

violation of the CFA can take place either in the context of the sale or advertisement of

merchandise or in the context of the "subsequent performance" of the defendant.

WWL has presented evidence that Defendants engaged in marketing to the public.

24

Plaintiffs point to marketing materials of America's PEO, which stated that (1) America's PEO had "the power to negotiate favorable discounts which benefit all of our employees"; (2) that an employer would want to contract with them "to eliminate worker's compensation headaches;" (3) that "there are direct economic savings that employee leasing can achieve.  By grouping together tens of thousands of employees, the leasing company can command lower group rates for workers' compensation insurance . . . . These savings are passed on to the leasing company's customers;" and (4) "America's PEO is insured for workers compensation with A-rated paper." (Thompson Opposition Decl. Ex. C.)  This evidence shows that America's PEO engaged in marketing.  However, WWL has presented no evidence that any of the statements above, most of which are quite vague, was false.  Therefore, WWL cannot sustain a CFA claim based on these marketing materials.

WWL also alleges that Sciarra and Hopkins can be held liable under the CFA for their "subsequent performance" under the Service Agreement.  Specifically, WWL cites Hopkins' statement that the FGH workforce would be covered under the service agreement, the issuance of allegedly false insurance certificates, and the transmission of invoices to WWL for services that were not rendered.  The CFA prohibits not only fraud in the advertisement and sale of merchandise, but also in the subsequent performance of the seller.  N.J. Stat. Ann. § 56:8-2; New Mea Constr. Corp. v. Harper, 497 A.2d 534, 543 (N.J. Super. App. Div. 1985) (finding CFA applicable to builder who used substandard materials).

WWL has presented some evidence of fraud in the subsequent performance of the Service Agreement.  There is evidence that Hopkins' statement that the FGH workforce would be covered was false.  (See, e.g.,Thompson Ex. B, Granite State's Denial of Dunn Claim.)  The

same evidence indicates that some of the certificates of insurance sent to WWL were false and that the bills sent to WWL specifically for coverage of the FGH workers (Thompson Decl. Ex. DD) were fraudulent.  Thus, there is sufficient evidence for WWL's CFA claim to survive Defendants' motion for summary judgment.

### F.  Conversion (Count Ten)

Both Plaintiff and Defendants seek summary judgment on Plaintiff's claim for conversion.  Plaintiff seeks summary judgment as to Sciarra and UJEX.  Plaintiff argues that it paid these defendants $211,754 through America's PEO to purchase insurance coverage for the FGH work force and for workers employed outside of the state of Pennsylvania.  Plaintiff further argues that Sciarra and UJEX kept its money and failed to obtain this insurance.  Defendants UJEX, AJAX, Hopkins, Brown and Sciarra also seek summary judgment with respect to Count Ten.  They argue that Plaintiff has not proven that it sustained any damages.  They further argue that Plaintiff has not stated a claim for conversion.  The court will grant Defendants' motion for summary judgment because Plaintiffs have not stated a claim for conversion.

Conversion is "the wrongful exercise of dominion and control over property owned by another in a manner that is inconsistent with the owners' rights."  Sun Coast Merch. Corp. v. Myron Corp., 922 A.2d 782, 799 (N.J. Super. Ct. App. Div. 2007) (quoting Port-O-San Corp. v. Teamsters Local Union No. 863 Welfare & Pension Funds, 833 A.2d 633 (N.J. Super. Ct. App. Div. 2003)).  Money may be the subject of conversion, but "[w]here there is no obligation to return the identical money, but only a relationship of a debtor and creditor, an action for conversion of the funds representing the indebtedness will not lie against the debtor."  Advanced Enterprises Recycling, Inc. v. Bercaw, 869 A.2d 468, 472 (N.J. Super. Ct. App. Div. 2005).

While it appears that New Jersey Courts have not addressed whether payments by an insured to an insurer can be the subject of conversion, other state courts have held that they generally cannot be.  See Willingham v. United Ins. Co. of Am., 628 So.2d 328, 333 (Ala. 1993) (finding no conversion where there was no evidence that insurance premiums were "segregated or identifiable"); Austin v. Indep. Life and Accident Ins. Co., 370 S.E.2d 918, 921-22 (S.C. Ct. App. 1988) (finding no conversion where there was "no evidence in the record [plaintiff's] premiums were separately maintained by [the insurance company] and not commingled with other premiums").

Plaintiffs rely on Glenfed v. Financial Corp. v. Penick Corp., 647 A.2d 852 (N.J. Super. Ct. App. Div. 1994) and Cambridge Mgmt. Group, LLC v. Robert A. Kosseff & Assocs., No. 05-3402, 2007 WL 2084895 (D.N.J. July 18, 2007), which are distinguishable from this case.  In Glenfed, the defendant had agreed to place money in a special account to be held in trust for the plaintiff and then diverted these funds into its own account.  647 A.2d at 855.  In Cambridge, the defendant also agreed to hold money in trust for the plaintiff.  2007 WL 2084895, at *4.  Here, by contrast, there is no evidence that Defendants were obligated to place WWL's payments in a separate account and hold them in trust for WWL.  Therefore, the Court finds that Defendants Sciarra, Hopkins, UJEX, AJAX, and Brown are entitled to summary judgment on Plaintiff's conversion claim.

## IV.  CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment on Counts Three, Four, and Ten of its complaint is denied.  Defendants' motion for summary judgment is granted as to Count Ten of Plaintiff's complaint, and denied as to Counts Three, Four, Five, Eight, and

Nine of Plaintiff's complaint.  An accompanying order shall issue today.


Dated: 4-6-09                                    /s/ Robert B. Kugler
                                                 ROBERT B. KUGLER
                                                 United States District Judge